**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| TAMMY FULLER, | : | Case No. 3:17-cv-427 |
| | : | |
| Plaintiff, | : | |
| | : | |
| | : | District Judge Walter H. Rice |
| vs. | : | Magistrate Judge Sharon L. Ovington |
| | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

---

## REPORT AND RECOMMENDATIONS[1]

---

## I.    <u>Introduction</u>

Plaintiff Tammy Fuller applied for Supplemental Security Income more than eight years ago, on August 19, 2010. The Social Security Administration denied her application initially and upon reconsideration. At Plaintiff's request, Administrative Law Judge (ALJ) David A Redmond held a hearing and concluded that she was not eligible for benefits because she is not under a "disability" as defined in the Social Security Act. Plaintiff disagreed and asked the Appeals Council to review his decision. The Appeals Council vacated ALJ Redmond's decision and remanded the case to an ALJ for resolution of several issues. After a second hearing, ALJ Redmond confirmed his previous non-disability finding. And, again, the Appeals Council vacated his decision and remanded the case—but this time with instructions to assign it to a different ALJ.

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

After a third hearing, ALJ Hockensmith concluded that Plaintiff was not under a disability and was thus not eligible for benefits. The Appeals Council denied review. Plaintiff brings this case challenging the Social Security Administration's denial of her application for Supplemental Security Income.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #12), Plaintiff's Reply (Doc. #13), and the administrative record (Doc. #6).

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Hockensmith's non-disability decision.

## II.  <u>Background</u>

At the time Plaintiff applied for disability benefits, she was forty-four years old and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. § 416.963(c). She has a marginal education. *See id*. § 416.964(b)(2).

### A.  **Plaintiff's Testimony**

Plaintiff testified at the hearing before ALJ Hockensmith that she struggles with depression. Her depressive episodes last three to four days and she has them "every couple of months." (Doc. #6, *PageID* #s 275-76). During the episodes, she wants to die and stays in her bedroom—her "safe zone." *Id.* at 275.

Plaintiff has difficulty getting along with others. She has been in jail twice for assault (for beating her wife-to-be). *Id.* at 281. She does not like to be around people.

*Id.* at 282. "I've been treated bad in my childhood and I just don't trust nobody. And when I get really mad, I start throwing things around and breaking things. *Id*.

She also has panic attacks three to four times a day. *Id.* at 278. They usually last five to ten minutes. *Id*. The attacks are triggered when she has to be around a lot of people and when she has a bad dream. *Id*. She has bad dreams—often about dying in a car—almost every night. 281-82.

In school, Plaintiff was held back twice and dropped out in sixth grade because she was pregnant. *Id.* at 264, 280. She was fourteen years old. Plaintiff struggles with reading and writing. *Id.* at 266. She is able to read small words but cannot understand what they means. *Id*. She cannot read her mail, menus, or paperwork. *Id.* at 267. She also has trouble with math. She can add and subtract "a little bit." *Id.* at 267-28.

In 2007, Plaintiff attempted to get a diploma from an online school. Unfortunately, she failed every subject. *Id.* at 264. When the school sent a second test, her wife completed it, and Plaintiff received a diploma. *Id.* at 264-65.

Plaintiff has problems with her left shoulder and both hands. Her left shoulder throbs if she lifts it too high and she can only carry a gallon of milk. *Id.* at 271-72. She can carry about ten pounds with her right arm. *Id*. at 272. She had arthritis and carpal tunnel in her left hand. It was so bad she could hardly move it. *Id.* at 273. In February 2016, she underwent carpal-tunnel surgery. *Id.* Unfortunately, she has had numbness since then and she may need a second surgery. *Id.* at 274.

Plaintiff injured her right hand while working on a car about five years before the hearing. *Id*. at 272. Her knuckles swell so much she "can't hardly make a fist

sometimes." *Id*. Additionally, her first finger is completely numb. *Id*. at 273. Together, these impairments make it difficult for her to hold on to things. *Id*. at 273-74.

In addition, Plaintiff has spurs and issues with her left hip. If she sits for more than thirty minutes, her hip throbs. *Id*. at 271. Her spurs make her feet tingle when she walks. *Id*. at 279. She can stand for thirty minutes at a time and walk half a block. *Id*. at 271. Every three months, they really bug her and she cannot walk at all. *Id*.

Plaintiff spends most of the day laying in a recliner on her right side. *Id*. at 274. She watches TV and colors. *Id*. She only leaves home for doctors' appointments. *Id*. at 262. Plaintiff has not had a driver's license in "a long time." *Id*. at 261. A friend drives her and her wife around. *Id*. She has older children and an eleven-year-old son. *Id*. at 262. Her son is currently in foster care because Plaintiff is not able to take care of him. *Id*. at 262, 280. She sees him every other weekend. They color and do crafts together. *Id*. at 263. Plaintiff does not have any contact with her older children. *Id*.

### B. Plaintiff's Treating Sources

#### i. Steven C. Burks, M.D.

Plaintiff's treating physician, Dr. Burks, completed two disability-related forms. On February 20, 2007, he indicated Plaintiff had five chronic medical conditions: lumbar/thoracic strain; left-shoulder bursitis; hyperlipidemia; depression disorder; and anxiety disorder. *Id*. at 885. Her health status was good and stable with treatment. *Id*. Dr. Burks opined Plaintiff could stand/walk for two hours without interruption for a total of four hours in an eight-hour day. *Id*. at 886. She could lift/carry up to five pounds frequently. *Id*. Her ability to push, pull, reach, or handle were markedly limited and her

ability to bend and move her feet repetitively were moderately limited. *Id.* Dr. Burks concluded that Plaintiff is unemployable. *Id.*

On May 15, 2007, Dr. Burks noted that as part of her treatment, he prescribed Vicodin, Valium, Zoloft, Zocor, and Phenergan. *Id.* at 884. Dr. Burks opined Plaintiff was medically dependent on these medications. *Id.*

### ii.  Han Mok Yong, M.D.

On September 9, 2010, Plaintiff's treating physician, Dr. Yong, indicated Plaintiff's medical conditions include hepatitis C, hypertension, anxiety, depression, and bipolar disorder. *Id.* at 735, 737. Her health status was poor but stable. *Id.* Dr. Yong opined Plaintiff's ability to walk, stand, and sit were limited. Further, she was extremely limited in all postural functions and all mental activities. *Id.* at 734, 736. He concluded Plaintiff was unemployable. *Id.* at 734, 737.

### iii.  Pamela Daufel, M.D.

On April 11, 2013, after seeing Plaintiff one time, Dr. Daufel completed a medical report. She diagnosed GERD, depression, left-shoulder pain; mixed urinary incontinence, obesity, back pain, and elevated blood pressure without hypertension. *Id.* at 912. She indicated that Plaintiff had an abdominal mass that caused pain when moving from supine to sitting. *Id.* at 911. Further, she had pain on palpation of her thoracic spine, cerebral column, left trochanter, and left shoulder. *Id.* Her left shoulder limits her ability to use her left arm. *Id.* at 912.

### iv.  Marcy Smith, MS, PCCC-S

Plaintiff's therapist, Ms. Smith, completed a mental impairment questionnaire and interrogatories in September 2016. She indicated that she has treated Plaintiff weekly since December 2015. *Id.* at 1693, 1697. Ms. Smith diagnosed chronic PTSD; bipolar disorder, depressed and severe with psychosis; and panic disorder with agoraphobia. *Id.* at 1693.

Ms. Smith noted that Plaintiff has chronic auditory and visual hallucinations that vary in severity; she has mood swings even when on medication; and she has severe anxiety and panic attacks. *Id.* at 1694. Plaintiff's symptoms can be managed but not resolved. *Id.* Together, her impairments and treatment would cause her to be absent from work more than three times a month. *Id.* at 1695.

Ms. Smith opined that Plaintiff has marked restrictions of activities of daily living; deficiencies of concentration, persistence, or pace; and episodes of deterioration or decompensation. *Id.* at 1695, 1705. She has extreme difficulties in maintaining social functioning. *Id.* Additionally, Plaintiff could not be prompt and regular in attendance because her "agoraphobia sometimes causes delays in her ability to leave the house, sometimes has cancelled appointments due to such distress." *Id.* at 1699. Her insomnia makes it difficult for her to get up in the morning. *Id.* at 1702. She cannot respond appropriately to supervision, co-workers, and customary work pressures because, "[she] is sensitive to how she is treated by those in authority, reacts to feeling treated in an inferior way. [She] is defensive when anxious, is highly self-conscious around others." *Id.* at 1699-1700. She cannot get along with coworkers without unduly distracting them or exhibiting behavioral extremes because, "During mood swings or anxious episodes

[Plaintiff] can be short-tempered. The psychotic symptoms can make her unsure of what is real at times." *Id.* at 1703.

### C. Examining Sources

#### i. William O. Smith, M.D.

Dr. Smith examined Plaintiff on November 23, 2010. He reached four clinical diagnosis:

> 1. Residual of fracture left clavicle with non-anatomic sensory loss left upper extremity and mild impairment with elevation of left arm and non-organic weakness of left hand.
> 2. Trochanteric bursitis left hip;
> 3. Heel spurs with mild impairment in walking.
> 4. Degenerative disc disease of her lumbar spine.

*Id.* at 753. He opined that she is capable of sedentary work. *Id.*

#### ii. George O. Schulz, Ph.D.

On November 19, 2010 Dr. Schulz evaluated Plaintiff and Dr. Tillman administered the Wechsler Adult Intelligence Scale (WAIS-IV). Dr. Schulz diagnosed panic disorder without agoraphobia, bipolar disorder not otherwise specified (NOS), and borderline intellectual functioning. *Id.* at 747. He opined Plaintiff's abilities to relate to others; understand, remember, and follow instructions; maintain attention, concentration to perform repetitive tasks with adequate pace and perseverance; and withstand the stress and pressures associated with day-to-day work activity are moderately impaired. *Id.* at 749.

On the WAIS-IV, Plaintiff obtained a full-scale IQ of 62. *Id.* at 747. Dr. Schulz found that despite her score, "her overall language usage/recognition and adaptive

behavioral functioning did not support a diagnosis of mental retardation." *Id.* He further explained, "today's psychometric testing is likely to underestimate her actual level of intellectual/cognitive functioning." *Id.* at 748.

### iii.   Stephen W. Halmi, Psy.D.

Dr. Halmi examined Plaintiff and he and/or his assistant administered several psychological tests in April 2013. Dr. Halmi diagnosed mood disorder NOS, anxiety disorder NOS, psychotic disorder NOS, borderline intellectual functioning, and personality disorder NOS with borderline and paranoid features. *Id.* at 926-27.

On the WAIS-IV, Plaintiff obtained a full-scale IQ composite score of 65, indicating "extremely low intellectual abilities." *Id.* at 921. Plaintiff's scores on the Wide Range Achievement Test-4 (WRAT-4), a test used to assess academic abilities, revealed "extremely low abilities to read, comprehend what she reads, spell, and compute mathematical equations." *Id.* at 923. Dr. Halmi opined that her academic skills rank between the second-grade and third-grade level. *Id.*

On the Million Clinical Multiaxial Inventory III (MCMI-III), a test used to objectively assess for psychopathology, Dr. Halmi noted that Plaintiff's "response style may indicate a broad tendency to magnify the level of experienced illness or a characterological inclination to complain or to be self-pitying. On the other hand, the response style may convey feelings of extreme vulnerability that are associated with her current episodes of acute turmoil." *Id.* at 923. Because she had so many elevated scores, Dr. Halmi concluded that her MCMI protocol was invalid. *Id.* at 923-24.

Plaintiff's total score of 38 on the Beck Depression Inventory II ranks in the severe range for depression. *Id.* at 924. On the Beck Anxiety Inventory, she obtained a 43, falling into the severe range for anxiety. *Id.* at 925. Last, on the Self-Directed Search Form R, a test used to assess vocational and occupational interests, Plaintiff scored highest in the artistic and realistic types. *Id.*

Dr. Halmi opined that Plaintiff "has a tendency to over-endorse psychopathology" but "put forth a valid effort" and "is not malingering." *Id.* at 926. Further, "she truly believes she is experiencing the symptoms reported, but has a tendency to be histrionic." *Id.* Interestingly, she "reported experiencing symptoms of almost every psychological condition in the DSM-IV-TR." *Id.* at 927.

Dr. Halmi opined that Plaintiff would need to be shown the task in training, rather than read about it, but she could learn a manual-labor position. *Id.* at 928. Further, "she does not have the emotional stability or social skills to manage difficult people. I opine that she would have difficulty meeting deadlines even if the task was simple and repetitive. I opine that she would respond to constructive criticism with hostility. Finally, I opine that she would have difficulty solving unforeseen, novel problems due to limited problem-solving skills." *Id.* at 928-29. He concluded that Plaintiff "is not a viable candidate for vocational rehabilitation … [and] is mentally unstable." *Id.* at 929. He recommended that she apply for Social Security disability benefits. *Id.*

### III.  **Standard of Review**

The Social Security Administration provides Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 1382(a). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. § 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . ." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV.     **The ALJ's Decision**

As noted previously, it fell to ALJ Hockensmith to evaluate the evidence connected to Plaintiff's application for benefits.  He did so by considering each of the five sequential steps set forth in the Social Security Regulations.  *See* 20 C.F.R. § 416.920.  He reached the following main conclusions:

Step 1:     Plaintiff has not engaged in substantial gainful employment since August 19, 2010.

Step 2:     She has the severe impairments of degenerative disc disease of the lumbar spine; residuals of left clavicle fracture; left hip bursitis; bilateral heel spurs; carpal tunnel syndrome; obesity; bipolar disorder; panic disorder; and borderline intellectual functioning.

Step 3:     She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:     Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "light work … with the following

additional limitations: (1) ability to alternate between sitting and standing for a minute or two every 30 minutes while remaining at the workstation; (2) no climbing of ladders, ropes and scaffolds; (3) occasional climbing of ramps and stairs; (4) occasional stooping, kneeling, crouching and crawling; (5) no overhead reaching with the left upper extremity; (6) occasional handling and fingering on the left; (7) frequent handling and fingering on the right; (8) occasional pushing/pulling with the upper extremities; (9) limited to simple, routine tasks; (10) in a static work environment with few changes in routine; (11) no fast paced work or strict production quotas; and (12) occasional contact with the public, coworkers and supervisors."

Step 4:    She has no past relevant work.

Step 5:    She could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 61-78).  These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability.  *Id.* at 78.

## V.    **Discussion**

Plaintiff contends that the ALJ failed to correctly evaluate (1) her mental impairments under Listing 12.05; (2) the medical-source opinions; and (3) her statements about pain.  The Commissioner maintains that substantial evidence supports the ALJ's decision.

### A.    **Listing 12.05**

Plaintiff contends that even if her impairments do not meet 12.05, they equal it. And, according to Plaintiff, ALJ Hockensmith failed to consider whether her impairments equaled a listing.  The Court, however, need not consider whether Plaintiff's impairments equal a listing because her impairments meet Listing 12.05C.

Listing 12.05 describes the criteria necessary to establish an intellectual disability:

Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
.   .   .
C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. § 404, Subpt. P, App. 1, § 12.05C.  Thus, a plaintiff seeking to establish an intellectual disability under Listing 12.05C must prove three elements: (1) an IQ score between 60 and 70; (2) a second impairment causing work-related limitations; and (3) significantly subaverage general intellectual functioning with deficits in adaptive functioning that began before age 22.  *Id.*

*IQ Score*

ALJ Hockensmith found, "Although the claimant's scores would seem to satisfy sections of 12.05(B), these sections are not satisfied because these scores were obtained well after the claimant attained the age 22."  (Doc. #6, *PageID* #66).  In reaching this conclusion, however, the ALJ requires more of Plaintiff than is needed by the Listing.  "While the claimant *may* use a qualifying IQ score before the age of 22 to demonstrate that his subaverage intellectual functioning initially manifested during his developmental period, *see Daniels v. Comm'r of Soc. Sec.,* 70 F. App'x 868, 873 (6th Cir. 2003) (unpublished decision), a claimant is by no means *required* to produce an IQ score

obtained prior to age 22." *West v. Comm'r of Soc. Sec.*, 240 F. App'x 692, 698 (6th Cir. 2007).

As observed by ALJ Hockensmith, in November 2010, Dr. Tillman administered the WAIS-IV and Plaintiff obtained a full scale IQ of 62. (Doc. #6, *PageID* #747). Dr.Halmi's assistant administered the WAIS-IV in April 2013 and she obtained a full scale IQ of 65. *Id.* at 921. Plaintiff's full scale IQ of 62-65 falls into the range required by the Listing.

*Second Impairment*

Plaintiff has also shown that she has other impairments that impose an additional and significant work-related limitation of function. The ALJ found that in addition to her borderline intellectual functioning, Plaintiff's severe impairments include degenerative disc disease of the lumbar spine; residuals of left clavicle fracture; left hip bursitis; bilateral heel spurs; carpal tunnel syndrome; obesity; bipolar disorder; and panic disorder. (Doc. #6, *PageID* #63).

These findings demonstrate that Plaintiff satisfies Listing 12.05C's requirement of an "additional and significant work-related limitation of function." The Regulations explain, "For paragraph [12.05]C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, *i.e.,* is a 'severe' impairment(s), as defined in §§ 404.1520(c) and 416.920(c)." 20 C.F.R. § 404, Subpt. P, App. 1, § 12.00(A). Consequently, the ALJ's determination at Step 2 that Plaintiff had several "severe" impairments under § 416.920(c) effectively determined that these impairments imposed

"additional and significant work-related limitation of function" in satisfaction of Listing 12.05C.

*Subaverage Intellectual Functioning with Adaptive Deficits*

The introductory paragraph of Listing 12.05 requires that the individual show "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period." 20 C.F.R. § 404, Subpt. P, App. 1, § 12.05. Looking first at general intellectual functioning, ALJ Hockensmith questioned the validity of Plaintiff's IQ scores: "At this late date, it is impossible to determine the effect that [Plaintiff's] history of substance abuse may have had on her cognitive abilities. Consequently, [her] IQ scores are not likely to be an accurate depiction of her IQ at age 22." (Doc. #6, *PageID* #67). ALJ Hockensmith is not a medical doctor, psychiatrist, or psychologist; he is not qualified to determine whether Plaintiff's prior drug use affected her cognitive abilities and IQ scores. *See Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) ("an ALJ 'may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence.'") (quoting *Meece v. Barnhart,* 192 F. App'x 456, 465 (6th Cir.2006); *see also Rohan v. Chater,* 98 F.3d 966, 970 (7th Cir. 1996) (stating "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings")). He did not identify any evidence in the record that suggests Plaintiff's cognitive abilities and IQ were influenced by her prior substance abuse. Thus, his conclusion appears to be only speculation.

ALJ Hockensmith nonetheless provided an additional reason to question whether Plaintiff had significantly subaverage general intellectual functioning before age 22. He found that although Plaintiff alleged she had a learning disability and was in special education classes in school, she did not provide any records to support her claim. The ALJ is correct that Plaintiff did not provide records from school. However, given that Plaintiff was only in school through sixth grade, any records would be very limited.

Despite this lack of records, there is evidence in the record establishing that Plaintiff had significantly subaverage general intellectual functioning manifested before age 22. For instance, Plaintiff's medical providers' treatment notes and opinions consistently indicate that Plaintiff was in special education classes but still struggled at school. (Doc. #6, *PageID* #s 744 ("On an average her grades in school were Fs."), 751, 916 ("I'm a slow learner. I don't understand much."), 927 ("She described herself as a slow learner."), 991, 1005 ("she did not comprehend what she was being taught."), 1012 ("she was in special education 'through all of the semesters … I can't spell right.' [Patient] reports she doesn't read well.")).

These notes are consistent with her extremely low scores on psychological testing. For instance, on the WRAT-4, "Her scores indicate extremely low abilities to read, comprehend what she reads, spell, and compute mathematical equations. Her academic skills rank between the second and third grade level." *Id.* at 923. Likewise, on the WAIS-IV, Plaintiff obtained a full-scale IQ of 65, indicating extremely low intellectual abilities. *Id.* at 921. Her subtest scores indicated, for example, extremely low verbal abstract reasoning abilities; knowledge of factual information; ability to concentrate

while manipulating mathematical mental problems; word knowledge; and visual-working memory. *Id.* Although these tests were administered after Plaintiff turned 22 years old, "there may be many reasons why an individual would not have had the opportunity or need to have a formal intelligence quotient test until later in life. The fact that one was not earlier taken does not preclude a finding of earlier retardation." *Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir. 1985).

Turning to deficits in adaptive functioning, ALJ Hockensmith found, "the evidence as a whole … does not demonstrate deficits in adaptive functioning consistent with listing-level intellectual disability." (Doc. #6, *PageID* #67). "Deficits in adaptive functioning … refer to how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background." Diagnostic and Statistical Manual of Mental Disorders, 5th ed., at p. 37. Additionally, "The American Psychiatric Association defines adaptive-skills limitations as 'concurrent deficits or impairments . . . in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.'" *Hayes v. Comm'r of Soc. Sec.,* 357 F. App'x 672, 677 (6th Cir. 2009) (quoting DSM-IV-TR at 49).

ALJ Hockensmith pointed to several examples of Plaintiff's activities he found inconsistent with deficits in adaptive functioning: "she prepares her own meals, grocery shops, and performs household chores. She has had meaningful relationships and has parented children. She … obtained and had a valid driver's license at one time. She …

could make her own purchases, count change, and manage money when she has to." (Doc. #6, *PageID* #67) (internal citations omitted).

But these activities are not necessarily inconsistent with a finding of intellectual disability. As Plaintiff stated, "The Listing does not require that a claimant be a vegetable." (Doc. #8, *PageID* #1735). In *Brown v. Sec'y of Health & Human Servs.,* the plaintiff had a driver's license, and when he was employed as a truck driver, he was able to record mileage, the hours he worked, and the places he drove. 948 F.2d 268, 270 (6th Cir. 2001). He could use public transit, visit friends, make change at the grocery store, do his own laundry, and clean his room. *Id.* He completed the sixth grade and had a limited level of reading comprehension—he had reading and math skills equivalent to a third-grade education. *Id.* The Sixth Circuit found that these activities were not inconsistent with a valid I.Q. of 68. *Id.* The Court noted that individuals with mild mental retardation[2], "[b]y their late teens . . . can acquire academic skills up to approximately sixth-grade level; during their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need guidance and assistance when under unusual social or economic stress. At the present time, *virtually all people with Mild Mental Retardation can live successfully in the community, independently* or in supervised apartments or group homes (unless there is an associated

<hr>

[2] On August 1, 2013, the Social Security Administration amended Listing 12.05 by replacing the words "mental retardation" with "intellectual disability." *See* 78 F. Reg. 46,499, 46,501 (to be codified at 20 C.F.R. § 404, subpt. P, app. 1). The Administration stated that the change "does not affect the actual medical definition of the disorder or available programs or services." *Id.* at 46,500. Thus, the amendment does not effect a substantive change, and the words "mental retardation" and "intellectual disability" have the same meaning and are sometimes used interchangeably.

disorder that makes this impossible).” *Id.* (emphasis in original) (citing DSM-III-R §
317.00).

Plaintiff was, similarly to the plaintiff in *Brown,* able to perform household chores,
make change at the grocery store; and obtain her license—albeit with a hearing rather
than written test.  Plaintiff likewise has a sixth-grade education and second to third-grade
academic skills.  Unlike the Plaintiff in *Brown*, Plaintiff has not performed semi-skilled
work for several years.  Indeed, she has an incredibly limited work history.  *See also
Dragon v. Comm’r of Soc. Sec.*, 470 F. App’x 454 (6th Cir. 2012) (graduating high
school and having a child are not inconsistent with verbal scale IQ of 58, performance
scale IQ of 51, and full scale IQ of 50).

The record contains significant evidence of Plaintiff’s deficits in adaptive
functioning.  Plaintiff has struggled with social skills since kindergarten.  She was
removed from kindergarten because of her aggressiveness.  (Doc. #6, *PageID* #s 744,
916) (“She was expelled from kindergarten for fighting.”).  She continued to have
disciplinary problems in school; she was frequently in fights and had problems with
classmates and teachers.  *Id.* at 744.  Further, Plaintiff has an extensive juvenile criminal
record.  6 at 917.  She “spent half of her life in juvenile detention.”  *Id.* at 917.

Plaintiff’s social deficits continued into her adulthood.  She describes herself as
“short-fused” and says “people get on her nerves, and she flies off the handle.”  *Id.* at
1011.  She reported that when a neighbor who was visiting “wouldn’t shut up,” Plaintiff
threw her over a banister.  *Id.*  Further, Plaintiff’s last primary-care physician will no
longer treat her because Plaintiff got angry and “cussed her out.”  *Id.*

The ALJ's reliance on Plaintiff's parenting and meaningful relationships is misplaced. Her relationships with her children and spouse illustrate some of her deficits in adaptive functioning. Plaintiff had her first child at fourteen years old. *Id.* at 280, 916. In total, she had seven children. Of those seven, she does not have a relationship—or any contact—with four, two are deceased, and the youngest child is in foster care. She only sees him every other weekend. *Id.* at 262-63, 280, 916. Although Plaintiff testified that she no longer hits her wife, she was arrested twice because, as she stated, "I beat my wife up." *Id.* at 281, 744) (Plaintiff was arrested for assault in February 2008 and spent thirty days in jail; she was arrested again for assault in 2009 and spent 90 days in jail.).

Plaintiff's reports are consistent with medical opinions of record. Dr. Halmi opined, "[she] has a long history of problems getting along with peers, authority figures, and the general public. She is emotionally labile." *Id.* at 928. Plaintiff's therapist, Ms. Smith, opined she could not work in coordination with or in proximity to others without being unduly distracted by them because she "is anxious and intensely self-conscious around other people." *Id.* at 1704. Plaintiff's treating physician, Dr. Yong, indicated she was extremely limited in every category of social interactions—for example, her ability to maintain socially appropriate behavior and interact appropriately with the general public. *Id.* at 736.

Plaintiff's significant mental health problems began at a very young age. She was removed from her mother's care when she was seven or eight years old. *Id.* at 743, 916. She was placed in the Dayton Mental Health Hospital for six months and then moved to the Dayton Children's Home. *Id.* at 743. She reported in an interview with Donald

Donegan at the Dayton Bureau of Vocational Rehabilitation that she has been involved in mental health therapy since age ten for suicide attempts and psychotic breaks. *Id.* at 915. When she was fourteen years old, she ran away from the Children's Home, dropped out of school, got married, and had a child. *Id.* at 280, 916. Plaintiff estimated that she began taking psychotropic medications when she was seventeen. *Id.* at 917. She has had visual and auditory hallucinations since she was 18 years old. *Id.* at 1694. In 1987, when Plaintiff was about 21 years old, a therapist at Mercy Mental Health diagnosed her with anxiety with panic attacks, depression, and bipolar disorder. *Id.* at 743. In 1989, a therapist diagnosed schizophrenia. *Id.* at 743.

Further, the evidence—described above—demonstrates Plaintiff's deficits in academic skills. Together, this evidence shows Plaintiff's significantly subaverage intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period as Listing 12.05C requires.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[3]

## B.      Remand

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*,

---

[3] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's other challenges to the ALJ's decision is unwarranted.

378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

Given ALJ Hockensmith's failure to adequately address Listing 12.05C, remand to the Commissioner is appropriate. The question is whether the case should be remanded to the Social Security Administration for further consideration or for an award of benefits.

In light of the fact that Plaintiff filed for disability over eight years ago,[4] and in light of the strong evidence of record while contrary evidence is lacking, there is no just

---

[4] When "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game." *Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (citing *NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 22 L.Ed.2d

reason to further delay this matter by requiring additional administrative proceedings.

*See Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004); *Wilder v. Apfel*, 153 F.3d

799, 804 (7th Cir. 1998); *Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992).

Accordingly, a reversal of the ALJ's decision and a judicial award of benefits are

warranted.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability finding be **REVERSED**;

2. This matter be **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for payment of benefits; and

3. The case be terminated on the Court's docket.

April 16, 2019

*s/Sharon L. Ovington*
Sharon L. Ovington
United States Magistrate Judge

---

709 (1969); *see also Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir.1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result.")).

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).